

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SMC CORP., LTD., a United Kingdom corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 07 C 1055 |
| v. | ) ) | Judge Ruben Castillo |
| LOCKJAW, LLC., a Delaware Limited Liability Company, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Plaintiff's motion for a preliminary injunction. For the following

reasons, the motion is granted.

### FACTS & PROCEDURAL BACKGROUND

Plaintiff SMC, Inc. ("SMC") is a United Kingdom corporation with its principal place of

business in Durham, United Kingdom. (R. 1, Compl. ¶ 1.) Defendant Lockjaw, LLC

("Lockjaw") is a Delaware limited liability company with its principal place of business in West

Chicago, Illinois. (*Id.* ¶ 2.) SMC brings this action under the Declaratory Judgment Act seeking

a declaration that an agreement entered into by the parties in July 2005 ("the Agreement") is

binding and enforceable. (*Id.* ¶ 3.)

SMC specializes in the sale and distribution of hand and power tools. (*Id.* ¶ 6.) PDI

Product Development, Inc. ("PDI") is an Arizona corporation that created and owns the patents

1

for self-adjusting, locking pliers sold under the name "Lockjaw."[1] (*Id.*. ¶ 7; R. 17, Def.'s Resp. to Pl.'s Mot., Ex. A, Poole's Aff. ¶¶ 2, 4.) Defendant Lockjaw is a trading company that was formed to take the Lockjaw products created by PDI to market. (R. 1, Compl. ¶ 8.) Robert Poole ("Poole") is president and sole shareholder of PDI, and is one of two managing members of Lockjaw. (R. 1, Compl. ¶ 9; R. 17, Def.'s Resp. to Pl.'s Mot., Ex. A, Poole's Aff. ¶ 3.) The two entities have other employees in common, including Chad Kirschner ("Kirschner"), who is "in charge of operations for both [Lockjaw] and PDI." (R. 19, Def.'s Mem. in Supp. of Mot. to Dismiss, Ex. A, Email from Robert Poole to Neil Stentiford, Managing Director of SMC).

On or about July 8, 2005, SMC and Lockjaw entered into a sales and distribution agreement granting SMC the exclusive right to distribute Lockjaw products in specified countries throughout Western Europe. (R. 1, Compl. ¶ 10 & Ex. A, Agreement.) The Agreement provides that it is to be governed by and construed in accordance with Illinois law. (*Id.* ¶ 13.) After entering the Agreement, SMC began selling the Lockjaw products. (R. 1, Compl. ¶¶ 11-13.) According to SMC's complaint, the parties' practice from July 2005 to January 2007 was for SMC to place its order for Lockjaw products and to make payment 30 days from the date of the bill of lading. (R. 1, Compl. ¶ 14.) The parties followed this practice for the placement of 27 orders. (R. 1, Compl. ¶ 15.)

On or about January 26, 2007, SMC received an email from Kirschner in which he stated

---

[1] The original complaint did not name PDI as a Defendant. (R. 1, Compl.) On March 15, 2007, Lockjaw filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(7) arguing that the complaint must be dismissed for failure to join an indispensable party, PDI, or alternatively that SMC should be ordered to file an amended complaint naming PDI as a Defendant. (R. 18, Def.'s 12(b)(7) motion.) The parties have since entered a stipulation agreeing that Plaintiff will file an amended complaint by April 9 which names PDI as a Defendant in this case. (R. 27-29.)

2

that full payment for Lockjaw products would now be required in advance of transfer of title. (*Id.* ¶ 16.) At the time of this email, there were certain orders that had already been placed by SMC; Kirschner's email indicated that the new payment policy applied to pending orders. (*Id.*) SMC's view is that the change in payment terms could not apply to outstanding orders pursuant to Paragraph 3 of the Agreement, which provides: "Prices and terms are to remain fixed unless adjusted by Lockjaw prior to receipt, or acceptance, of an order." (*Id.*, Ex. A, Agreement ¶ 3.) SMC asserts that Lockjaw's modification of the payment terms constituted a fundamental change in the parties' business relationship. (R. 1, Compl. ¶ 16.)

SMC further alleges that Lockjaw, specifically Kirschner and Poole, have wrongfully sought to require SMC to turn over its customer lists and detailed customer contact information, arguing that such action is required by Paragraph 4(h) of the Agreement. (*Id.* ¶ 35.) In SMC's view, Paragraph 4(h) only requires it to keep Lockjaw apprised of "the status of key sales," which it claims to have done. (*Id.* ¶ 36.) There is a provision of the Agreement, Paragraph 9, which requires SMC to turn over information regarding its customers, but this provision is triggered only upon termination of the Agreement. (*Id.*, Ex. A, Agreement ¶ 9.)

On February 22, 2007, SMC filed this action seeking a declaratory judgment that: (1) the Agreement is binding and enforceable; (2) Lockjaw breached the Agreement by changing the payment terms on orders that were already placed; and (3) SMC is not required to provide its customer lists to Lockjaw pursuant to Paragraph 4(h) of the Agreement. (R. 1, Compl. ¶¶ 21-37.) SMC also raises a promissory estoppel claim related to Lockjaw's alleged arbitrary increase of prices, and seeks an award of damages in the amount of $1.9 million. (*Id.* ¶¶ 38-44 & p. 7.)

3

On March 6, 2007, SMC filed a motion for a preliminary injunction,[2] alleging that Lockjaw has been improperly contacting SMC's customers, representing to them that the Agreement has been terminated, and informing them that Lockjaw will now be distributing its own products in the European market. (R. 10, Pl.'s Mem. in Supp. of Mot. at 1.) According to SMC, Poole contacted SMC's largest customer in Germany and Switzerland and offered to sell Lockjaw products at prices that undercut the prices SMC had been offering pursuant to the terms of the parties' Agreement. (R. 13, Brailey Decl. ¶ 6.) SMC argues that such action is damaging its business reputation, causing it to lose customer goodwill, and destroying its distribution network, in which it has invested approximately $750,000 and "countless" personnel hours. (R. 10, Pl.'s Mem. in Supp. of Mot. at 1-2; R. 12, Stentiford Decl. ¶ 5.) As such, SMC requests that the Court enjoin Lockjaw from: (1) terminating the Agreement; (2) contacting SMC's customers within its territory; and (3) interfering with any shipments of Lockjaw products currently on order or in transit. (R. 10, Pl.'s Mem. in Supp. of Mot. at 7-8.)

In its response to the motion, Lockjaw states that it has "no objection to continuing with the manufacture and shipment of goods ordered by SMC as long as payment to Lockjaw and/or PDI is guaranteed." (R. 17, Def.'s Resp. to Pl.'s Mot. at 2.) Nonetheless, Lockjaw asserts that it does have the right to communicate directly with SMC's customers because the Agreement is "currently terminated due to SMC's material breach in not paying its invoices on time." (*Id.*)

---

[2] Although SMC has styled its motion as a request for a temporary restraining order ("TRO") and preliminary injunction, under the Federal Rules a TRO is granted in situations of dire urgency where notice cannot be given to the adverse party. *See* Fed. R. Civ. P. 65(b). Additionally, TROs may not exceed 10 days. *Id.* Because Lockjaw has been given notice of and has participated in these proceedings, and because SMC appears to be seeking far more than a 10-day restraining order, we treat their motion as requesting a preliminary injunction.

4

Alternatively, Lockjaw asserts that under the Agreement it has the right to terminate by giving SMC 90 days written notice. (*Id.*). Lockjaw asserts that it gave such notice on February 26, 2007, so that the Agreement will terminate "in any event no later than May 25, 2007." (*Id.*) As a third alternative, Lockjaw asserts that the Agreement will terminate on April 12, 2007, if SMC fails to provide adequate assurance of due performance pursuant to 810 ILCS 5/2-609(4) in accordance with Lockjaw's March 13, 2007 request. (*Id.*)

Lockjaw also presents its own version of certain facts. Specifically, Lockjaw asserts that prior to February 2006, it had a licensing agreement with PDI to sell Lockjaw products in Europe. (*Id.* at 4 & Ex. A, Poole's Aff. ¶ 6.) In February 2006, "due to the failure on the part of Lockjaw to comply with the terms of its licensing agreement with PDI, the licensing agreement was terminated" and replaced with a new licensing agreement that only allowed for the sale of Lockjaw products in the United States and Canada. (*Id.*, Ex. A, Poole's Aff. ¶ 7.) PDI agreed to sell Lockjaw products directly to SMC for sale to its customers, although Lockjaw's obligations under the Agreement "were never assigned to or assumed by PDI." (*Id.* ¶ 11.) On March 22, 2006, Poole notified SMC that all future purchase orders should be sent to PDI.[3] (*Id.*, Ex. 2, Email from Robert Poole to Neil Stentiford.) According to Lockjaw, SMC and PDI allegedly discussed the need to enter into a formal agreement; several drafts were exchanged but no agreement was ever reached. (*Id.*, Ex. A ¶ 12.) Despite the absence of a formal agreement, "[u]ntil recently, PDI manufactured and delivered the goods that were the subject of the SMC

---

[3] SMC disputes that it has a contractual arrangement with PDI and instead argues that it was simply placing orders through PDI at Lockjaw's direction pursuant to Paragraph 3 of the Agreement: "All orders for the Product shall be submitted to Lockjaw's customer service representative in Crystal Lake, Illinois, or in a manner set by Lockjaw." (R. 1, Compl., Ex. A ¶ 3.)

purchase orders sent to PDI after March 2006." (*Id.*, Ex. A ¶ 10.)

In January 2007, PDI sent two invoices to SMC demanding payment of approximately $324,000. (*Id.*, Ex. 3, Invoices.) The invoices indicated that payment became due in February 2007. (*Id.*) According to Lockjaw, in late February 2007, after being "reminded" by SMC that it could not change the payment terms on pending orders, Lockjaw "backed off its requirement that invoices be paid in advance of release of bills of lading." (*Id.* at 5 & Ex. A ¶ 13.) Lockjaw asserts that it released the bill of lading on the pending orders but SMC still failed to pay. (*Id.*) Lockjaw further asserts that a few days after the filing of this complaint, "Lockjaw/PDI sent written notice to SMC that it was terminating its contracts with SMC as a result of SMC's refusal to pay the Invoices." (*Id.* at 5.) On March 13, 2007, PDI made a written demand to SMC for adequate assurances of due performance under the contract. (*Id.*) According to Lockjaw, "It was not until SMC refused to pay [the invoices] that PDI first contacted SMC's European customers to notify them of SMC's material breach, the termination of the SMC contract and PDI's desire to do business directly with those European customers." (*Id.*, Ex. A ¶ 16.)

In its reply, SMC argues that it did not pay the invoices because Lockjaw improperly changed the terms of payment on the pending orders, requiring SMC to pay for the goods before the bill of lading is released. (R. 22, Pl.'s Reply at 2-4.) In other words, "Lockjaw cannot create what they claim to be a material breach of the Agreement by themselves breaching the terms of the Agreement." (*Id.* at 4.) Although the precise timeline of events is not entirely clear as to the pending orders that are the subject of this lawsuit, and although SMC had apparently not made payment as of the time of its request for injunctive relief, as of this date SMC has received the products and bill of lading on the pending orders and has made full payment for them. (R. 33,

6

Def.'s Suppl. Br. at 3 n. 3.)

SMC argues that because of Lockjaw's ongoing interference with its customers, "the business situation between SMC and its customers is on the verge of spiraling out of control." (R. 22, Pl.'s Reply at 1.) SMC asserts that one of its most important customers, Wurth, recently cancelled sales meetings between the two companies and that its contact person at Wurth "questioned whether he will be allowed to do business with SMC in the future as a result of this situation." (*Id.* at 1-2.) SMC further asserts that it is "not looking to be relieved of its obligation to pay for the goods that it orders from Lockjaw," but that Lockjaw must in turn by required to abide by the parties' Agreement. (*Id.* at 2.)

## ANALYSIS

As the Supreme Court has observed, "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). To obtain a preliminary injunction, the movant must show (1) they have some likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer irreparable harm which, absent injunctive relief, outweighs the harm the non-movant will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). The Court employs a "sliding scale" analysis, whereby the greater the likelihood of success on the merits, the less of a showing that is required relative to risk of harm, and vice versa. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). In deciding whether to grant injunctive relief, the Court must bear in mind that the purpose of a preliminary injunction is

7

"to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 726 (7th Cir. 1998).

### 1. Likelihood of success on the merits

SMC argues that it is likely to succeed on the merits of its claims, and that it is simply seeking to preserve the status quo while the underlying contract dispute is decided by the Court. (R. 10, Pl.'s Mem. in Supp. of Mot. at 4.) As an initial matter, we must point out that the contract at issue is poorly drafted; nonetheless, we must interpret it by its own terms. *See Brooklyn Bagel Boys, Inc. v. Earthgrain Ref. Dough Prod., Inc.*, 212 F.3d 373, 378 (7th Cir. 2000) (under Illinois law court must look to plain language of the contract); *William Blair & Co., LLC v. FI Liquidation Corp.*, 830 N.E.2d 760, 770 (Ill. App. Ct. 2005) (observing that "a court must construe a contract according to its own language, not according to the parties' subjective constructions"). We also must construe the contract as a whole. *Brooklyn Bagel Boys, Inc.*, 212 F.3d at 378. While we cannot definitively resolve the contract dispute based on the evidence before us, we find textual support in the Agreement for SMC's claim that the payment terms could not be changed with respect to pending orders, and its claim that SMC is not required to turn over its customer lists pursuant to Paragraph 4(h) while the Agreement remains in effect.

Whether SMC materially breached the Agreement by failing to pay the invoices, so as to justify Lockjaw's termination of the contract, is a complex fact question that must be decided in the context of this litigation. *See Elda Arnhold & Byzantio, LLC, v. Ocean Atl. Wood. Corp.*, 284 F.3d 693, 700 (7th Cir. 2002); *William Blair & Co., LLC*, 830 N.E.2d at 779. As one Illinois court explained:

8

> The determination of whether a breach of a contract is material is a complicated question of fact involving an inquiry into such matters as whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage.

*William Blair & Co.*, 830 N.E.2d at 779. Even more difficulty is posed when the contract itself does not conclusively indicate that the parties intended such a breach would be material. *Id.* (reversing grant of summary judgment where contract did not state that failure to comply with express authorization provision would constitute material breach).

Here, the Agreement is silent as to whether non-payment (or, in effect, late payment) as to two pending orders would constitute a material breach that would justify Lockjaw's termination of the Agreement. The only specific provision governing termination, Paragraph 8, describes certain situations in which SMC can terminate the Agreement. (R. 1, Compl., Ex. A ¶ 8.) The provision relating to termination by Lockjaw states that "[n]otice of termination can occur by Lockjaw in the event that sales quotas are not met." (*Id.*) SMC has submitted unrebutted evidence indicating that its sales quotas have been met. (*See* R. 12, Stentiford Decl. ¶ 6; R. 13, Brailey Decl. ¶ 5.)

Lockjaw points to another portion of Paragraph 8 allowing termination if there is a "significant failure of SMC to keep trade accounts current with Lockjaw" or if SMC fails "to comply with applicable laws (section 12) which could cause termination by Lockjaw at any time." (R. 1, Compl., Ex. A ¶ 8.) Lockjaw's view is that under this language the Agreement automatically terminated as soon as the invoices it sent to SMC went unpaid. (Tr. of

9

Proceedings, Mar. 22, 2007, at 13-14.) The contract, however, does not define "trade accounts" or explain what is meant by "significant failure." Regardless, it is apparent that the language cited by Lockjaw, when read in context, applies only within the first six months of the contract period (or prior to March 31, 2006), during which time Lockjaw was not permitted to terminate except in very limited circumstances. (*See id.*) As to the "applicable law" provision, the only applicable law mentioned in the Agreement is the U.S. Foreign Corrupt Practices Act, (*see id.* ¶¶ 8, 12), and Lockjaw has made no allegation that SMC violated this Act.

Because the contract's predominant purpose is the sale of goods, we must also construe it in accordance with Illinois' version of the Uniform Commercial Code ("UCC"), 810 ILCS 5/1-101, *et seq. See Echo, Inc., v. Whitson Co., Inc.*, 121 F.3d 1099, 1102 (7th Cir. 1997). The UCC imposes general obligations on both the seller and buyer: "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." 810 ILCS 5/2-301. The contract here does not specify how and when payment is to be made, but the parties' course of dealing was for SMC to make payment 30 days after the bill of lading was released. *See* 810 ILCS 5/1-205(4) ("The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other. . . ."). Although the UCC provides certain remedies to a seller when a buyer "wrongfully . . . fails to make payment due," including suspension of its performance and, in certain instances, cancellation of the contract, *see* 810 ILCS 5/2-703, there is a dispute here as to whether SMC wrongfully failed to "make a payment due." SMC's view is that it did not breach the Agreement by failing to pay the invoices because Lockjaw improperly altered the payment terms on pending orders by requiring payment prior to release of the bill of lading. There is

10

textual support in the Agreement for SMC's position that payment terms could not be changed with respect to pending orders. A party cannot exercise the right to cancel a contract if it is itself in breach of the contract. *Goldstein v. Stainless Proc. Co.*, 465 F.2d 392, 395 (7th Cir. 1972).

Additionally, in a contract like this one where the contract provides for multiple sales that are to be made separately, *see* 810 ILCS 5/2-612, the seller may not cancel the entire agreement unless the buyer's breach is "of the whole contract." 810 ILCS 5/2-703. Even assuming SMC made late payment on two orders, we have difficulty concluding that such action constitutes breach of the whole contract; the evidence before us indicates that SMC made timely payment on at least 27 orders and that the late payments were caused by the disagreement over Lockjaw's attempt to change the terms of payment. *Compare P.R.S. Intern., Inc. v. Shred Pax Corp.*, 703 N.E.2d 71 (Ill. 1998) (seller justified in withholding delivery and cancelling contract where buyer told seller it would refuse to accept delivery of products, that it would prefer seller seek another buyer, and that it wanted to become "completely disassociated" with seller).

Lockjaw takes issue with the fact that SMC did not make payment of the invoices immediately after the bill of lading was released, but again the parties' prior course of dealing was for SMC to pay within 30 days following the release of the bill of lading. *See* 810 ILCS 5/1-205; *Echo*, 121 F.3d at 1102. Although we do not know the exact date the bill of lading was released after Lockjaw abandoned its efforts to change the payment terms on pending orders, Poole's affidavit indicates that it was sometime in late February 2007. (R. 17, Def.'s Resp. to Pl.'s Mot., Ex. A ¶ 13.) Payment was made by SMC on March 27, 2007. (R. 33, Def.'s Supp. Br. at 3 n.3.) To the extent SMC paid beyond the 30 days, we do not condone such behavior; nevertheless, in light of the surrounding circumstances, we do not find a few days delay fatal to

11

SMC's claims. The parties agree that SMC has now made full payment on the invoices, and as SMC appropriately acknowledges, it will be required to make full payment for all goods it receives pursuant to the Agreement.

We also do not find persuasive Lockjaw's argument that the contract dispute is really a matter between SMC and PDI because Lockjaw no longer sells products in Europe due to the change in its licensing agreement with PDI.[4] There is textual support in the Agreement for SMC's argument that it was simply placing orders with PDI at the direction of Poole pursuant to Paragraph 3 of the Agreement. (R. 1, Compl., Ex. A, Agreement ¶ 3 ("All orders for the Product shall be submitted to Lockjaw's customer services representative in Crystal Lake, Illinois, or in a manner set by Lockjaw.") The precise interrelation between Lockjaw and PDI is not clear from the documents before us, but it is apparent that the two entities are closely related and are both controlled by Poole. Indeed, in an email Poole sent to SMC's managing director, he "apologize[d] for the confusion regarding Lock-Jaw LLC and PDI Development Inc." and signed the email "Robert Poole, President Lockjaw LLC, PDI Development Inc." (R. 18, Def.'s 12(b)(7) Mot., Ex. A, Email.) In its opposition Lockjaw refers to itself as "Lockjaw/PDI" and appears to demand payment from SMC on invoices issued by PDI. (R. 17, Def.'s Resp. to Pl.'s Mot. at 4-8, Ex. 3 & 4, Invoices.) Because of the close interrelation between the two companies and Poole's role in both, we are also not persuaded by Lockjaw's argument that it is PDI, not Lockjaw, that has been contacting SMC's customers. The evidence before us indicates that it was Poole who contacted at least one of Lockjaw's key customers. (R. 12, Stentiford Decl. ¶ 9.)

---

[4] We find it somewhat perplexing that an alleged licensing dispute arose between PDI and Lockjaw given that Poole appears to control both entities. The nature of the dispute is not explained in the documents before us.

12

We find it irrelevant whether he purported to do so on behalf of PDI, since he is a managing member of both corporations.

As to Lockjaw's argument that the Agreement will terminate in any event in May 2007 because it has given 90 days written notice of termination, our reading of the Agreement indicates that the 90-day notice provision merely applies to how notice will be given, and assumes that the parties have a valid basis for terminating the Agreement in the first place. (*See* R. 1, Compl., Ex. A, Agreement ¶ 8 & 8.1.) As stated above, the plain terms of the Agreement only allow Lockjaw to terminate at this stage if SMC has failed to meet its sales quotas or if SMC violates applicable law, neither of which has been demonstrated.

Even if the Court were to accept Lockjaw's argument that the Agreement will terminate in May 2007, this would not explain or justify Lockjaw's actions in contacting SMC's clients in late February, telling them the Agreement had been terminated, and offering to sell them Lockjaw products directly. We think this evidences a lack of good faith by Lockjaw. *See* 810 ILCS 5/1-203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement."). A similar analysis applies to Lockjaw's claim that the Agreement will terminate in April 2007 because SMC failed to provide adequate assurances of performance pursuant to 810 ILCS 5/2-609. We find it somewhat duplicitous that Lockjaw would treat the contract as terminated (indeed, telling SMC's customers that the contract *is* terminated), and at the same time seek adequate assurances of future performance by SMC pursuant to 810 ILCS 5/2-609. Although a party is permitted to suspend its own performance while awaiting adequate assurances under 5/2-609, the contract is not considered repudiated until the other party has been given an opportunity to provide adequate assurances and fails to do so.

13

810 ILCS 5/2-609(4). The application of 5/2-609 also triggers certain fact questions that must be determined by the Court, including whether Lockjaw had reasonable grounds for demanding adequate assurances in the first place, and whether the assurances given by SMC were adequate under the circumstances. 810 ILCS 5/2-609, Comments 3 & 4; *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167 (7th Cir. 1976); *Coral Bay v. Zakaspace Corp.*, No. 96 C 3844, 1999 WL 446823 (N.D. Ill. 1999). SMC has given assurances of future payment by offering to provide letters of credit or depositing the full amount of payment with this Court, or other third party, at the time orders are placed. Lockjaw does not explain why these assurances do not allay its fears of future nonpayment by SMC.[5] Thus, Lockjaw's reliance on 5/2-609 cannot justify its ongoing contact with SMC's customers.

For all of these reasons, we find that SMC has established more than some likelihood of success on the merits.

### 2.    No Adequate Remedy At Law/Irreparable injury

Even if there is some doubt as to SMC's success on the merits, SMC has made a strong showing that absent injunctive relief, it will suffer irreparable harm to its business goodwill through the loss of customers and damage to its reputation. *See Ty, Inc.*, 237 F.3d at 895 (in deciding whether to grant injunctive relief the court employs a sliding scale analysis, whereby the greater the showing of harm the less of a showing that is required as to likelihood of success). The evidence before us suggests that one of SMC's key customer relationships may have already been damaged as a result of Lockjaw's actions. (R. 12, Stentiford Decl. ¶¶ 9-10; R. 13, Brailey

---

[5] Lockjaw expresses a preference for the escrow arrangement but indicates that the letter of credit would be acceptable as long as it guarantees payment in full by a third party should SMC fail to pay by the 30th day. (R. 33, Def.'s Supp. Br. at 4 n.5.)

14

Decl. ¶¶ 6-7.) The Seventh Circuit has held that "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill. . . ." *Ty, Inc.*, 237 F.3d at 902. Thus, these type of injuries are presumed irreparable. *Id.*; *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir.1994) ("We have stated that showing injury to goodwill can constitute irreparable harm that is not compensable by an award of money damages."); *Reinders Bros. v. Rain Bird E. Sales Corp.*, 627 F.2d 44, 53 & n. 7 (7th Cir. 1980) (loss of small but valuable portion of clientele not compensable in monetary damages); *see also Northwest Bakery Distrib., Inc. v. George Weston Bakeries*, No. 04 C 8233, 2005 WL 66044 at *4 (N.D. Ill. Jan. 11, 2005) ("[P]laintiff's loss of goodwill, key relationships and current experience and know-how will not easily be repaired and will certainly not be readily compensable in damages.")

We agree with Lockjaw that SMC can obtain money damages for lost profits in the event it can prove the Agreement was improperly terminated; nonetheless, this does not address SMC's loss of goodwill, which the case law indicates is not compensable by money damages. We also are not persuaded by Lockjaw's argument that SMC cannot demonstrate irreparable injury because "it is undisputed that the contractual relationship between Lockjaw and SMC will be terminated no later than May 26, 2007," at which time SMC will be required to turn over its customer list pursuant to the Agreement. Although Paragraph 9 of the Agreement does provide for the turnover of SMC's customer information in the event of termination of the Agreement, as stated above, there is a dispute regarding whether Lockjaw can terminate the contract simply by giving 90 days written notice. While the Agreement is in effect, we find no basis for Lockjaw to contact SMC's customers. Accordingly, we find that the second factor weighs in favor of

granting injunctive relief.

### 3.    Balancing of Harms

As discussed above, we have found that SMC will suffer irreparable injury to its customer relations and goodwill if the injunction is not granted. SMC has offered evidence that its customer confidence has already been shaken as a result of Lockjaw's actions, and that one of its main customers has questioned whether it will be able to continue doing business with SMC. SMC posits that even if it is successful in this litigation, as a result of Lockjaw's ongoing actions SMC's distribution network will be damaged beyond repair and it will be pressured to reduce its prices "below sustainable levels." (R. 22, Pl.'s Reply at 3.) The Seventh Circuit has recognized that monetary damages are inadequate if they "may come too late to save the plaintiff's business." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *see also Gateway*, 35 F.3d at 1140 (affirming district court's finding that plaintiff corporation's "loss of goodwill, or eventual demise, qualifies as irreparable harm for which there is no adequate remedy at law.").

Nonetheless, Lockjaw argues that the balance of hardships tips in its favor because it would be unfairly prejudiced if it were required to continue delivering goods to SMC without any assurances that SMC will actually pay for the goods. (R. 17, Def.'s Resp. to Pl.'s Mot. at 12-13.) We agree that such a scenario would be unfair; however, SMC has provided assurances that it will pay for all goods ordered pursuant to the Agreement, (R. 22, Pl.'s Reply at 4 n.2 & 6 n.3), and the Court will ensure that SMC meets its obligations as part of its continuing jurisdiction over this case. Further, as will be discussed below, we are requiring SMC to obtain a letter of credit for any orders placed and also to post an injunction bond, thus minimizing the risk of harm

16

to Lockjaw of being wrongfully enjoined. *See Ty, Inc.*, 237 F.3d at 902 (in weighing the parties' relative interests the court should try to "minimize the costs of being mistaken"). Thus, we find the balance of harms weighs in favor of granting injunctive relief.

### 4. The Public Interest

Last, we must consider whether entry of a preliminary injunction would harm the public interest. *Christian Legal Soc'y*, 453 F.3d at 859. As SMC observes, courts in this District have recognized that the public interest is served by enforcing valid contracts. *See Cook Inc. v. Boston Scientific Corp.*, No. 01 C 9479, 2002 WL 31236289 at *6 (N.D. Ill. Oct. 1, 2002); *Arcadia Health Serv., Inc., v. A+ Health Care, Inc.*, No. 96 C 8363, 1997 WL 24737 at *5 (N.D. Ill. Jan. 17, 1997); *see also Caterpillar, Inc. v. Jerryco Footwear*, 880 F. Supp. 578, 593 (C.D. Ill. 1994) (observing that "[t]he public has an interest in seeing that parties that enter into commercial agreements honor those agreements"). As explained above, we have found that SMC established a likelihood of success on the merits of its claim that the Agreement has not been properly terminated. Lockjaw has not addressed this factor or otherwise identified any potential harm to the public if injunctive relief is granted in this private contract dispute, and we can discern none. Accordingly, we find that the fourth factor weighs in favor of granting SMC's request for injunctive relief.

### 5. Bond

Finally, we must determine what type of security will be required of SMC. Federal Rule of Civil Procedure 65(c) provides:

> No restraining order or preliminary injunction shall issue except upon
> the giving of security by the applicant, in such sum as the court deems
> proper, for the payment of such costs and damages as may be incurred

17

or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c). The purpose of an injunction bond is to compensate the defendant in the event he prevails on the merits for the harm that an injunction entered before the final decision caused him. *Ty, Inc.*, 292 F.3d at 512. The appropriate amount of the bond is subject to our discretion. Fed. R. Civ. P. 65(c); *Gateway*, 35 F.3d at 1141. The Seventh Circuit has directed that "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000). Setting the amount of security too low may produce irreparable injury "because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.*

In its response to Plaintiff's motion, Lockjaw raised a general concern about the injury it would suffer if it is required to continue filling orders from SMC and SMC fails to make payment, which could in turn impact relations with Lockjaw's manufacturers, who must also be paid. (R. 17, Def.'s Resp. to Pl.'s Mot. at 7 n. 14, 12.) Lockjaw did not attempt to quantify this injury or otherwise suggest an appropriate amount for a bond, although at argument Lockjaw's counsel indicated that the amount of injury would hinge on the volume of orders placed by SMC during the pendency of the litigation. (Tr. of Proceedings at 11-12.) We invited Lockjaw to submit further documentation recommending an appropriate amount for a bond. (*Id.* at 16.) Lockjaw submitted a supplemental brief regarding the bond issue, but still has not proposed a specific amount for a bond. Instead Lockjaw argues generally that it will lose profits, approximately 15 percent on each order, if forced to continue dealing with SMC; in other words, its profits would be higher if it was able to deal with SMC's customers directly. (R. 33, Def.'s

18

Supp. Br. at 4 & Ex. A, Poole Decl. ¶ 2.) SMC has not addressed the issue of bond, or offered

any suggestion as to an appropriate bond amount, but agrees that it remains responsible for

payment of all Lockjaw goods it receives. (R. 22, Pl.'s Reply at 2, 6 & n. 3.) Given the

circumstances of this case, and the fact that SMC is requesting that this Court essentially enforce

an ongoing business relationship with an unwilling party, we find an injunction bond of $500,000

warranted to cover Lockjaw's potential lost profits and other damages in the event it is

subsequently determined that Lockjaw was wrongfully enjoined. SMC must post this bond in

addition to providing letters of credit ensuring payment of all orders placed with Lockjaw while

this litigation is pending.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for preliminary injunction (R. 9) is granted.

1.      Defendant Lockjaw, LLP, its members, officers, agents, servants, employees,

attorneys, and those in active concert or participation with them who receive actual notice of this

order by personal service or otherwise pursuant to Fed. R. Civ. P. 65(d), are hereby **ENJOINED**

from terminating the Sales and Distribution Agreement dated July 8, 2005, except under the

following conditions: SMC fails to meet sales quotas as established in the Agreement (Section

7); SMC fails to comply with applicable laws (Section 12); or SMC fails to pay invoices in a

manner consistent with the terms of this order. In the event that Lockjaw terminates the

Agreement based on any of the conditions enumerated above, such termination will only become

effective 90 days following written notice of the termination (Section 8.1).

2.      Defendant Lockjaw, LLP, its members, officers, agents, servants, employees,

attorneys, and those in active concert or participation with them who receive actual notice of this

order by personal service or otherwise pursuant to Fed. R. Civ. P. 65(d), are hereby **ENJOINED** from contacting SMC's customers within SMC's exclusive territory specified in Exhibit 1 of the Sales and Distribution Agreement, with the addition of Italy and Scandinavia, for any purpose without SMC's express written consent.

3.      Both parties shall continue to fully perform their duties under the Agreement in accordance with their obligation of good faith and fair dealing imposed by Illinois law, using the same price and payment terms as existed on or before January 26, 2007, including that payment will be due 30 days from the date of the bill of lading. All future orders submitted by SMC shall be secured by a letter of credit which guarantees full payment by a third party in the event SMC fails to pay an invoice by the 30th day.

4.      SMC shall post a security bond in the amount of $500,000 with the Clerk of the Court within seven days of the date of this order.

The Clerk of the Court is directed to enter a separate judgment order pursuant to Federal Rule of Civil Procedure 58(a)(1).

Entered:

**Judge Ruben Castillo**
**United States District Court**

**Dated: April 3, 2007**